## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9392 | **DATE** | 9/27/2002 |
| **CASE TITLE** | Harry Carmichael, et al vs. Payment Center, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Accordingly both Carmichaels' rescission claim and Payment Center's Coutercomplaint seeking foreclosure of the mortgage (concededly rendered moot by payment and release) are dismissed from this action. At the next status hearing in this action, which this opinion schedules for 9 a.m. October 10, 2002, counsel for the parties should come prepared to discuss not only (1) what remains of this lawsuit (and the appropriate road towards its resolution) but also (2) the possible appropriateness of the imposition of sanctions pursuant to Rule 11(c)(1)(B).

(11) ■ [For further detail see order attached to the original minute order.]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARRY CARMICHAEL, et al., )
)
        Plaintiffs, )
)
v. ) No. 01 C 9392
)
PAYMENT CENTER, INC., )
)
        Defendant. )

DOCKETED SEP 3 0 2002

## MEMORANDUM OPINION AND ORDER

Harry and Louise Carmichael (collectively "Carmichaels") and Payment Center, Inc. ("Payment Center") have filed cross-motions with supporting and responsive memoranda under Fed. R. Civ. P. ("Rule") 16, each side seeking to narrow the issues in this Truth in Lending Act ("TILA")[1] action brought by Carmichaels in consequence of Payment Center's having made them a short-term loan secured by a second mortgage on their Oak Park residence. Those cross-efforts appear to have demonstrated that this is a lawsuit that should never have been brought, given the objective good faith standard that is imposed on every lawyer and litigant under Rule 11(b).

In March 2001 Carmichaels negotiated a $69,000 loan transaction with Payment Center--secured (as already indicated) by a junior mortgage on their residence--to provide them with funds to pay off the contractor for the home's major remodeling.

---

[1] All citations to TILA's provisions will take the form "Section --," referring to the statutory numbering in Title 15 rather than to TILA's internal numbering.



What the loan documents called for were 12 monthly payments of $709.74 each (that is the monthly amount that would have been required to self-amortize a 30-year loan at the agreed annual interest rate of 12%), with each such payment to be applied first to accrued interest and then toward principal, and then with a balloon payment at the end of the 13th month comprising the last month's interest and all remaining principal "if not sooner paid." But when the Truth-in-Lending Disclosures document was prepared by one of Payment Center's people and delivered to Carmichaels at the closing, it contained the vastly (and clearly) erroneous figure of $188,716.76 under the "FINANCE CHARGE" heading. That mistake, a patent absurdity in such a short-term loan transaction, escaped everyone's attention at the closing.[2] At that time Carmichaels simply signed the printed Truth-in-Lending disclosures form that contained that erroneous entry.

Now however they seek to use that obvious mistake as the

---

[2] Could anyone who had troubled to look at the numbers have really believed that the finance charges for a one year and one month loan at 12% interest would have come to over 270% of the principal sum being borrowed? Ridiculous. That figure would have been correct if the loan had indeed been self-amortizing over a full 30-year term, for in that event the loan payments "on schedule" would have added up to $257,716.76 (representing $69,000 in principal payments plus 360 interest payments aggregating the $188,000-plus figure). It would seem most likely that a careless punching of the wrong button on the computer, or some other comparable error by a clerical person, created the mistaken entry--but the cause of the mistake is really irrelevant here under the circumstances, although its obviously accidental nature might play a part in determining the appropriate amount of penalty if one were called for (as it surely is not).

2

basis for reaching into Payment Center's corporate pocket to the tune of $8,331.43 in "actual damages" (!), $2,000 in statutory damages because of Payment Center's asserted failure to provide accurate disclosures and $2,000 in statutory damages for Payment Center's failure to honor Carmichaels' purported rescission well after the fact, plus costs and attorneys' fees. That level of greed would seem to call into play a variant on the old saying in the stock market investment field that "bulls may make money and bears may make money, but it's hogs who should get slaughtered."

Unlike the Fair Debt Collection Practices Act standard that measures the adequacy of disclosures in terms of the highly "unsophisticated reader" (see, e.g., Johnson v. Revenue Mgmt. Corp., 169 F.3d 1057, 1060 (7th Cir. 1999)), TILA prescribes an objective "reasonable person" approach (see, e.g., Rendler v. Corus Bank, N.A., 272 F.3d 992, 999 (7th Cir. 2001); Smith v. Check-N-Go of Ill., Inc., 200 F.3d 511, 515 (7th Cir. 1999)). In this case it is apparent that any reasonable person (indeed, even an unsophisticated one) who looked at the assertedly offending disclosure document would have had to recognize immediately that the boxcar number listed as "finance charges" was the product of some kind of mathematical mistake--and it is worth noting parenthetically that Harry Carmichael has a bachelor's degree in electrical engineering and computer science, while Louise Carmichael has an associate's degree in business administration!

3

Even if the mistaken disclosure had constituted a technical TILA violation, then, its obviousness to any reasonable reader (to say nothing of the college-educated Carmichaels) would have negated any concept of detrimental reliance.

But there is far more. TILA itself actually negates such an <u>overstatement</u> of finance charges as constituting an inaccuracy for statutory purposes--here is Section 1605(f)(1)(B) (emphasis added)(a provision reconfirmed by the implementing Regulation Z, 12 C.F.R. §226.23(g)(1)(ii)):

> In connection with credit transactions not under an open end credit plan that are secured by real property or a dwelling, the disclosure of the finance charge and other disclosures affected by any finance charge--
>
> > (1) shall be treated as being accurate for purposes of this subchapter if the amount disclosed as the finance charge--
> >
> > \* \* \*
> > (B) is <u>greater</u> than the amount required to be disclosed under this subchapter.

In fact the actual finance charges paid by Carmichaels came to less than $6,000 (precisely $5,994.80),[3] so that their total payments of principal plus those finance charges were just under $75,000 rather than the patently incorrect listed figure of more than a quarter million dollars. That being so, TILA expressly

---

[3] That smaller amount was attributable to Carmichaels having availed themselves of the opportunity to make a very substantial prepayment, rather than limiting themselves to the loan documents' scheduled monthly payments. More on this subject later.

4

provides that "the disclosure of the finance charge and other disclosures affected by any finance charge...shall be treated as being accurate"--and that torpedoes Carmichaels' TILA claim.[4] And relatedly, it is equally absurd for Carmichaels to attempt to pyramid on the obviously mistaken finance charges figure to calculate a purported Annual Percentage Rate of 130.7721% on the loan, rather than the 12% rate accurately disclosed by Payment Center and actually charged during the short life of the loan.

Carmichaels advance one added complaint: They cavil at the loan documents' language, which was mirrored in the TILA disclosure statement, that attached no numerical value to the 13th and last payment. As already indicated, the loan documents spoke of paying "the balance of all unpaid principal and

---

[4] Carmichaels' attempted response on this issue is just as bogus as the other arguments addressed here. Its counsel points to (and even emphasizes) the provisions of Section 1605(f)(2)(A), to which Payment Center's obviously mistaken overstatement of finance charges does not conform. But that contention, and a fortiori that emphasis, are totally unsupportable. By its terms Section 1605(f)(1) identifies any mistaken disclosures "as being accurate <u>for purposes of this subchapter</u>" (which comprises all of Sections 1601 through 1667 f) if that subsection's condition is satisfied, as it is in this case. That then creates total excusability for <u>all</u> TILA purposes. By contrast, Section 1605(f)(2) identifies a special concept of "accuracy" for only one TILA section--Section 1635, which deals only with a borrower's rescission remedy--if its condition is satisfied. If counsel's position that those requirements are to be treated as inextricably linked rather than as independent (as they clearly are) were to be credited, a lender could equally urge that no rescission could be obtained by the borrower if the lender's finance charge disclosure stated a figure <u>less</u> than what TILA required--a truly bizarre notion. In short, Carmichaels' counsel are flat-out wrong.

5

interest" at that time, while the Truth-in-Lending Disclosures statement similarly referred to "the 13th installment of all remaining principal balance." In that respect, it should be remembered that there was no prohibition against prepayment in part or in full by Carmichaels if they so chose--as already stated, the mortgage referred to the last payment as being "of all principal and interest, <u>if not sooner paid</u>" (emphasis added). As n. 3 reflects, that was not just a hypothetical possibility, for Carmichaels in fact exercised that privilege by making a substantial prepayment of $45,000.

In that sense, then, it was not possible to state in advance an absolutely firm figure for the last payment. It is true that Section 1638(a)'s lengthy list of required disclosures by a creditor (lender) include, as subparagraph (a)(6), "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments." In this instance Payment Center complied with that requirement in all respects--with the argued-for possible exception that the balloon payment was expressed in words, rather than in terms of a then-unknown dollar figure. In terms of the loan transaction at issue here, this Court cannot conscientiously treat that as a TILA violation that might trigger a totally unwarranted sanction on Payment Center.

That then would appear to negate any violation of TILA and, in turn, to wash out Carmichaels' claims in their entirety.

Absent a violation, no violation-related "actual damages" may be asserted, and the assessment of statutory damages would be an oxymoron.

Before this opinion turns from Carmichaels' rejected claim of "actual damages," note should be taken of the especially egregious nature of one aspect of that claim. As Carmichaels would have it, they were "forced to refinance their home twice as a result of the Loan with the Payment Center, Inc." (Carmichaels Statement of Material Facts ¶20). First they refinanced for $234,000 in May 2001, just two months after the borrowing from Payment Center, to pay off their existing first mortgage of some $117,000 (id. ¶¶21-23 and Ex. J). Then a year later, in June of this year, they obtained new refinancing for $279,500 (id. ¶¶24-26 and Ex. K), no doubt to take advantage of the ongoing decline in interest rates. Those refinancings, they say, occasioned closing costs (nearly $10,000 the first time, nearly $5,000 the second), of which they contend a portion should be borne by Payment Center.

Just to state that claim betrays its outrageousness. There is of course no question from the very nature of the Payment Center loan--small monthly payments for a year, then a total payoff a month later--that it represented interim and not long-term financing. That is not only a matter of common sense but is confirmed by the fact that the entire net loan proceeds of

7

$68,700 obtained from Payment Center were paid to the contractor who was remodeling Carmichaels' home. And the natural consequence of that, with Carmichaels having opted for a short-term second mortgage loan from Payment Center, had to be an overall refinancing (unless Carmichaels were somehow to have come into that kind of money from some other source--maybe winning the lottery?). It is a serious misrepresentation for Carmichaels and their counsel to assert that the necessary refinancing was somehow caused by the terms of the Payment Center loan or by any of its disclosures in connection with that loan--their need for refinancing was instead caused (forced?) by Carmichaels themselves, by their having chosen to take out a short term loan for their convenience in the first place.

Indeed, perhaps the height of irony lies in Carmichaels' effort to emphasize the purpose of TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit" (Section 1601(a), quoted at Carmichaels' Mem. 4). But Carmichaels never assert that they would have shopped the Payment Center loan elsewhere, even in the face of their being told (erroneously) that they were going to pay over $188,000 in finance charges on a 13-month $69,000 loan. Moreover, Carmichaels actually paid Payment Center only $300 in processing fees, receiving fully

$68,700 out of the $69,000 loan with which they were able to pay off their remodeling contractor. By contrast, when they then quickly negotiated the first long-term loan (what they label as "refinancing") to pay off their first mortgage (and not Payment Center's second mortgage), they paid almost $5,000 in the aggregate for a 1% loan discount, an appraisal fee, the first mortgagee's "administration fee" and the mortgage brokers' "origination" and "processing" fees. Then Carmichaels' second long-term loan, as already stated, cost them almost another $5,000 in closing costs. On further thought, it is really more accurate to label as chutzpah rather than irony the attempt by Carmichaels and their lawyers to shift any part of the burden of their self-created and self-imposed costs on a lender that had accommodated their need to pay off their remodeling contractor (eliminating any possibility of contractors' liens or other such difficulties) while they bought time to shop for permanent financing at their convenience.

Finally, a few words may be said as to Carmichaels' final claim as originally posed in their Complaint: that seeking rescission of the Payment Credit loan. Once again the non-TILA-violative conduct on the part of Payment Center would also seem to have scotched Carmichaels' second-guessing and belated effort at such rescission. But that need not be decided, for although Carmichaels' Response Mem. 3-5 initially challenges Payment

Center's contention that Carmichaels rescission claim in Complaint ¶¶23-30 has been mooted because the loan has been paid off and the Payment Center mortgage released of record, that discussion concludes with this statement (id. at 5):

> The Carmichaels no longer seek rescission of the loan per se, nevertheless because PCI failed to timely rescind and the Carmichaels are entitled to an award of actual and statutory damages.

Accordingly both Carmichaels' rescission claim and Payment Center's Countercomplaint seeking foreclosure of the mortgage (concededly rendered moot by payment and release) are dismissed from this action.

## Conclusion

TILA is a consumer-oriented statute with a worthwhile social goal: to provide those who must borrow money with the kind of information they need to make informed decisions. Despite the commendable nature of that statutory purpose (or regrettably, sometimes because of that very purpose), TILA is often made the target of critics who attack it on various grounds--sometimes including the premise that it promotes the institution of overly burdensome claims and lawsuits. It is particularly regrettable, then, to encounter a lawsuit such as this one, which is so extreme a distortion of TILA's goals as to provide fuel for TILA's critics and thus to endanger its salutary existence.

This opinion's initial paragraph has referred advisedly to the standards imposed by Rule 11(b) on both litigants and their

lawyers. At the next status hearing in this action, which this opinion schedules for 9 a.m. October 10, 2002, counsel for the parties should come prepared to discuss not only (1) what remains of this lawsuit (and the appropriate road towards its resolution) but also (2) the possible appropriateness of the imposition of sanctions pursuant to Rule 11(c)(1)(B).

                                                    Milton I. Shadur
                                                    Senior United States District Judge

Date: September 27, 2002